**Laurence F. DEWITT, Plaintiff,**

v.

**AMERICAN STOCK TRANSFER COMPANY, Michael Karfunkel and George Karfunkel, doing business as partners of American Stock Transfer Company, and Alrac Corporation, Defendants.**

**No. 76 Civ. 4126 (GLG).**

United States District Court, S. D. New York.

June 20, 1977.

Butzel & Kass, New York City, for plaintiff; Stephen L. Kass, New York City, of counsel.

Snow & Becker, New York City, for defendants, American Stock Transfer Co. and Karfunkel; Charles Snow, New York City, of counsel.

Carro, Spanbock, Londin, Rodman & Fass, New York City, for defendant, Alrac Corp.; Reginald L. Duff, New York City, of counsel.

## OPINION

GOETTEL, District Judge.

In June, 1975, plaintiff DeWitt purchased 134,700 shares of defendant, Alrac Corporation ("Alrac"), an amount representing, at that time, approximately 13% of the outstanding shares. Although the single certificate bore no restrictive legend, Alrac's stock transfer agent, defendant, American Stock Transfer Co. ("A.S.T."), refused to transfer the shares. Its purported reluctance stemmed from the possibility that the transfer might violate the Securities Act of 1933 since the shares were admittedly not registered and the size of the transferred interest raised doubts as to the availability of an exemption from the Act's registration requirements. Plaintiff seeks to impose liability upon both defendants for wrongful refusal to transfer the shares and for failure to note the restrictions on transfer on the face of the certificate.

Defendant AST has answered. Both defendants join in a motion to dismiss the complaint under F.R.C.P. 12(b) or for summary judgment on grounds which will be detailed hereafter.

Plaintiff is described in his brief submitted in opposition to the instant motion as a retired, small businessman, living in Florida, whose principal source of income derives from investments. He claims that this was his first private stock purchase and

that his prior familiarity was with transactions executed on either a national exchange or in the over-the-counter market.

Plaintiff maintains that he first heard of Alrac from a fishing partner, Barkley, who recommended the purchase as a good, although speculative, investment. The risk stemmed from the fact that Alrac had filed a voluntary petition under Chapter XI of the Bankruptcy Act and the cornerstone of the plan approved by the bankruptcy judge was that Standard Oil of California would invest millions of dollars for the right to develop valuable patents which were the primary assets of Alrac.[1] Barkley, an executive in the parent corporation of Athena Communications Corp. ("Athena"), present owner of the stock, had an officer of Athena contact plaintiff. Plaintiff claims that in a telephone conversation with this officer, he was given assurances that the certificate for the 134,700 shares representing Athena's total interest was not legended nor was the sale of the stock restricted in any way. Additionally, plaintiff was not requested to make any representation that he would hold the stock for investment. The agreed upon sales price was $26,940 of which one-half was contributed by Conn Central Corp., apparently a corporation controlled by a personal friend of DeWitt.

Armed with the certificate, a corporate resolution of Athena authorizing the sale, and a check for the transfer fees, plaintiff presented himself at the New York office of Alrac's stock transfer agent, A.S.T., on July 11, 1975. According to plaintiff, he was told that the corporate resolution was inadequate and, instead, the transfer required a resolution of Athena's Board. Having obtained this second resolution, plaintiff returned, on August 8, 1975, to A.S.T., endorsed the Athena certificate, and

was given a receipt for the stock. DeWitt contends that he was promised that the transfer would be effected in about one week. Not having heard from A.S.T. within the following week, plaintiff called A.S.T. and was allegedly told that a stop-transfer notation appeared on the books for Alrac's former transfer agent, Morgan Guaranty Co., with regard to these shares. Upon confirmation by Morgan Guaranty that no such order had been entered, plaintiff again requested the transfer only to be told that no transfer would be made because it might violate the securities laws.

The undisputed facts relating to the prior ownership of these shares bear out the possibility of a securities law violation. Under the Securities Act of 1933, registration of each sale of a security is required unless the circumstances are such that they fall into one of the statutory exemptions from registration. Section 4(1) of the Act, 15 U.S.C. § 77d(1), exempts "transactions by any person other than an issuer, underwriter, or dealer." Although the sale by Athena to plaintiff, a member of the public and thus precisely the type of individual intended to be protected by the Act, might superficially appear to fall within this exemption, an "underwriter" is so broadly defined that plaintiff might be a "statutory" underwriter. This follows because Section 2(11), 15 U.S.C. § 77b(11), includes within the meaning of an underwriter "any person who has purchased from an issuer with a view to . . . the distribution of any security . . . .. As used in this paragraph the term 'issuer' shall include, in addition to an issuer, *any person directly or indirectly controlling . . . the issuer.*" (emphasis added). Under this definition, if Athena was in a position to control[2] the issuer,

---

**1.** Another aspect of the plan was the issuance by Alrac of approximately 1,500,000 new shares of common stock to its trade creditors and debenture holders. Plaintiff asserts that this would dilute his interest to approximately 5.2%. The plan had been strongly opposed by Barnes, the founder, major shareholder and inventor of the process for which Alrac held the patents. Upon appeal by Barnes, the Second Circuit refused to convert the Chapter XI proceedings into a Chapter X reorganization and

confirmed the plan. *Barnes v. Alrac Corp. (In re Alrac Corp.),* 550 F.2d 1314 (2d Cir. 1977).

**2.** Defendants claim that the SEC presumes that control can be exerted through ownership of an interest exceeding 10% of the shares of a corporation. The SEC did establish a rule of thumb that any person purchasing more than 10% of a registered offering was presumed to be an underwriter within the meaning of Sec-

plaintiff's purchase from it would render him an underwriter with the result that the exemption under Section 4(1) of the Act would not be available.

The corporation from which Athena acquired the stock, New Jersey Zinc, had, in fact, the right to designate two members of Alrac's Board of Directors. The parties dispute, however, whether Athena succeeded to this right upon acquiring the shares. In any case, while Athena held the certificate, it filed a Schedule 13D in 1972 with the SEC and Alrac as required by a Williams Act provision, 15 U.S.C. § 78m(d) for all persons acquiring more than five percent of the outstanding shares of a corporation. This filing indicates that the shares were being held for investment, which in turn suggests that the shares were restricted in Athena's hands, since this is the type of representation commonly made when shares are acquired in a private offering. See SEC Rule 146.

A.S.T. alleges in its answer that the circumstances relating to the prior ownership of the shares was supplied at its request by Alrac's Chairman of the Board and Chief Executive Officer, Wolfe. Alrac contends that it took no position with regard to whether or not the shares should be transferred into DeWitt's name, other than the concern, expressed by letter to DeWitt, that the transfer comply with the applicable law. Plaintiff characterizes Alrac as actively opposing the transfer. Its purported motive was to eliminate any potential alliance between DeWitt and Barnes, the founder, and a major stockholder of Alrac who was attempting to block approval of the bankruptcy plan favored by Alrac's management.

A.S.T.'s response to the situation was an offer either to issue a new certificate bearing a restrictive legend or to issue an unrestricted certificate if DeWitt would supply an attorney's letter vouching for the legality of the transfer. Plaintiff attempted, instead, to get Alrac's approval through Wolfe. This was withheld for the apparent reason that it was either unnecessary or improper if the transfer, in fact, required registration. It seems that plaintiff also tried to secure an opinion letter from an attorney, but was unable to do so. Moreover, by this time, A.S.T. was not only refusing to transfer the shares, but also refusing to return the Athena certificate to plaintiff.

Plaintiff's response was to commence a suit in New York Supreme Court on August 21, 1975 naming A.S.T. as the defendant and seeking a mandatory injunction compelling A.S.T. to issue an unrestricted certificate and $2,000 in punitive damages. This maneuver was followed by a petition before the bankruptcy judge on September 5, 1975 to compel the holding of the annual shareholders' meeting required by Alrac's by-laws. Apparently, no meeting was contemplated at that time since shareholders' meetings had been suspended since 1972. This petition was ultimately denied.

The situation apparently remained static until March 15th of the following year when plaintiff allegedly received an attractive offer from Skaneateles Distributors Inc. for the purchase of his interest in Alrac. The purported purchase price was to be $3 per share, a figure representing approximately fifteen times what plaintiff had paid less than a year earlier. Because the stock was selling in the over-the-counter market (according to the "pink sheets") at $2.75 bid and $3.25 asked, the offering price also exceeded the market price, but this may have been due to the large size of the block to be acquired. Plaintiff claims that the offer was withdrawn on April 1, 1975 due to his inability to transfer an unrestricted interest. The withdrawal coincided with a precipitous decline in the bid and ask prices quoted in the over-the-counter market.

---

tion 2(11). Jennings & Marsh, *Securities Regulation* 272 (4th ed. 1977). This is distinguishable from the concept of "control" which is determined with reference to all the facts and circumstances and which the SEC declines to correlate with any predetermined percentage interest. 2 Loss, *Securities Regulation* 775–82 (2d ed. 1961); *Hill York Corp. v. American Int'l Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971).

Two final events have significance for this action. On April 23, 1976, the SEC suspended trading in Alrac due to its failure to file the required annual report, Form 10–K. Plaintiff claims that this had a foreseeably severe effect on the market, making it impossible for him to locate a purchaser and mitigate his damages. The second event was A.S.T.'s transfer of the long-desired unrestricted certificate in May, 1976, prior to any resolution of the then pending action in the New York Supreme Court. A.S.T. claims that the transfer was prompted solely by a statement from a member of the regional office of the SEC that the Commission had no interest in the transfer to plaintiff.

This suit was commenced on September 16, 1976. The complaint states three causes of action. Count I names A.S.T. and its individual partners as defendants and claims damages for the "wrongful failure to issue certificates" prior to the substantial decline in price discussed above. Plaintiff seeks $202,050 in damages, an amount representing his share of the price offered by Skaneateles for the shares plaintiff purchased. (The other half of the shares represented by the Athena certificate is beneficially owned by Conn Central Corp., which has not been made a plaintiff in this action.) Count II is directed against the issuer Alrac, plus the defendants named in the first count, and alleges that Alrac "aided and abetted" A.S.T. in wrongfully refusing to transfer the certificate into plaintiff's name following his purchase.

Subject matter jurisdiction for these two counts is premised upon diversity of citizenship. Plaintiff is a Florida resident, A.S.T. and its partners are located in New York and Alrac is a Delaware corporation having its principal place of business in Connecticut. Personal jurisdiction over Alrac is based upon New York's long-arm statute, N.Y.C.P.L.R. § 302 (McKinney 1972).

In the third count, plaintiff claims that Sections 13(a) and 15(d) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(a), 78o(d), create an implied cause of action in favor of all shareholders whose interest diminishes in value as a result of a corporation's failure to file reports required by the Act. In this case, the failure had the foreseeable result of an SEC suspension of trading. Jurisdiction of this cause of action, which is directed solely against defendant Alrac, arises from Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Venue is claimed to be in the Southern District of New York, where the claim arose. 28 U.S.C. § 1391(b).

Defendants challenge the complaint on the following grounds:

(1) Defendants join in moving to dismiss Counts One and Two under Rule 12(b)(6) for failure to state a claim upon which relief can be granted or for summary judgment under Rule 56(b). Alrac additionally moves to dismiss Counts One (to the extent it may be construed as stating a claim against it) and Two for lack of *in personam* jurisdiction. Alrac also moves to dismiss Count Two because the conclusory allegations of a conspiracy with A.S.T. is deficient under F.R.C.P. 9(b).

(2) Defendant Alrac moves to dismiss Count Three under Rule 12(b)(1) for lack of subject matter jurisdiction and under 12(b)(6) for failure to state a claim under the Securities Exchange Act of 1934, and claims that venue there is improper under the Exchange Act provision, 15 U.S.C. § 78aa. Alrac also requests the Court to determine that plaintiff is barred from seeking relief under the securities laws because he failed to timely file a Schedule 13D pursuant to the Williams Act, 15 U.S.C. § 78m(d), required when an individual acquires more than 5% of the outstanding shares of a corporation. (Plaintiff filed this form shortly after commencing this action. Defendant now charges that the statements contained therein are materially false and misleading.)

(3) Both defendants join in seeking an award of costs and expenses, including attorneys' fees, or, alternatively, requiring plaintiff to post an undertaking pursuant to Section 18(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78r(a).

*Failure to State a Claim—Counts One and Two*

Both the Uniform Commercial Code and case law recognize the mandatory duty of an issuer to register a transfer of stock, its liability for a wrongful refusal to transfer and its privilege to make reasonable inquiry into the rightfulness of the transfer. *Kanton v. United States Plastics, Inc.,* 248 F.Supp. 353 (D.N.J.1965). In Delaware,[3] the applicable Code provision is Section 8–401, Del.Code tit. 6, § 8–401, which provides in pertinent part:

"(1) Where a security in registered form is presented to the issuer with a request to register transfer, the issuer is under a duty to register the transfer as requested if . . . (e) the transfer is in fact rightful or is to a bona fide purchaser."

In addition, Section 8–406 Del.Code tit. 6, § 8–406 states:

"(1) Where a person acts as . . . transfer agent . . . for an issuer in the registration of transfers of its securities . . . (b) he has with regard to the particular functions he performs the same obligation to the holder or owner of the security and has the same rights and privileges as the issuer has in regard to those functions."

These provisions operate to place upon a transfer agent a duty coextensive with that of the issuer to the person requesting transfer. *Kenler v. Canal National Bank,* 489 F.2d 482 (1st Cir. 1973).

Case law has recognized that a wrongful refusal to transfer shares may amount to a conversion. *Edina State Bank v. Mr. Steak, Inc.,* 487 F.2d 640, 644 (10th Cir.), *cert. denied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974); *Gasarch v. Ormand Industries, Inc.,* 346 F.Supp. 550 (S.D.N.Y. 1972); *Kanton v. United States Plastics, Inc., supra; Annotation, Remedy For Refusal to Transfer Stock,* 22 A.L.R.2d 12. The refusal is not wrongful, however, if the issuer and transfer agent can point to reasonable grounds for their failure to act. *Travis Investment Co. v. Harwyn Pub. Corp.,* 288 F.Supp. 519 (S.D.N.Y.1968); *see Melville v. Wantschek,* 403 F.Supp. 439 (E.D.N.Y.1975).[4]

Defendants argue that once they were on notice that the transfer might violate the Securities Act of 1933, their refusal to transfer became reasonable. In this regard, defendants emphasize the power of the original owner of the shares, New Jersey Zinc, to designate two members of Alrac's Board of Directors, the size of the block (13% of the outstanding shares) and the SEC presumption that blocks in excess of 10% have the power to exert control. Defendants also rely upon several cases which recognize the right of an issuer and its transfer agent to make appropriate inquiries regarding the prospect that a particular transaction might violate the securities laws.

In the first of these cases, *Travis Investment Co. v. Harwyn Pub. Corp., supra,* the court held that it was reasonable to refuse transfer following receipt of a written notification from the SEC that persons in control of the company might attempt an illegal, unregistered sale of their shares. In *Melville v. Wantschek, supra,* refusal to transfer was not unreasonable where stop transfer orders appeared on the agent's books as a result of investment letters signed by the plaintiff. Finally, in *Charter Oak Bank & Trust Co. v. Registrar & Transfer Co.,* 141 N.J.Super. 425, 358 A.2d

---

3. The parties have only obliquely raised the issue of what is the applicable law in this case. Plaintiff claims, however, that the Code provisions relied upon have been adopted in both New York, the situs of the refusal to transfer, and Delaware, the situs of Alrac's incorporation. The Uniform Commercial Code incorporates its own choice of law provision, § 8–106 which states that the law of the jurisdiction of organization of the corporation whose stock is involved controls. *See Edina State Bank v. Mr. Steak, Inc.,* 487 F.2d 640 (10th Cir.), *cert. de-nied,* 419 U.S. 883, 95 S.Ct. 150, 42 L.Ed.2d 123 (1974). It is unclear whether Delaware law would similarly control the common law claims for refusal to transfer.

4. Under § 8–403(2) of the Code, a thirty day delay is presumed reasonable where the issuer is under a duty to inquire into adverse claims. *See Travis Investment Co. v. Harwyn Pub. Corp., supra,* at 526.

505 (1976), an outstanding investment letter, a stop transfer order and the denial of an SEC no-action letter all combined to inhibit the transfer.

■ Even this short summary of these cases indicates that the circumstances generating those refusals to transfer varied substantially from those presented here. It may very well be, however, that once defendants were on notice that Athena had not registered the transfer to plaintiff of a sizeable block of stock having at least some indicia of control, their refusal to transfer was reasonable. Moreover, defendants' actions appear to be only a belated recognition of their duties under the securities acts. For example, SEC Rule 145 which outlines the issuer's and transfer agent's responsibilities when securities are privately offered (presumably the manner in which New Jersey Zinc and Athena acquired the stock) requires them to take the minimal precautions of legending the certificate and placing stop transfer orders on their books.[5] Nevertheless, while defendants may have acted "reasonably" as that term is construed by the cases, this is clearly an issue for trial.

There are sharp disputes at every juncture among the parties on many of the facts relating to the reasonableness of defendants' conduct. For example, plaintiff notes that there are open questions relating to whether or not Athena (plaintiff's seller) ever had or could have exercised control, the true proportionate interest represented by plaintiff's shares under the reorganization plan already approved by the bankruptcy judge,[6] the nature of Alrac's communications with A.S.T. and the reasons behind A.S.T.'s equivocal conduct in first agreeing to the transfer and then refusing. In addition, throughout this period, Alrac's management was locked into a dispute with Barnes, the founder and a principal shareholder in Alrac, over the reorganization plan. Without a clear factual background to work from, it is impossible to gauge and apply such an uncertain standard as "reasonableness." Moreover, the presence of such an issue creates a genuine issue of material fact foreclosing summary judgment. Cf. *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317 (2d Cir. 1975); *The Savage Is Loose Co. v. United Artists Theatre Circuit, Inc.*, 413 F.Supp. 555, 560 (S.D. N.Y.1976).

■ Distinct from defendants' possible liability for wrongful refusal to transfer is their potential liability under Section 8–204, Del.Code tit. 6, § 8–204 of the Uniform Commercial Code which, in effect, places the risk upon the issuer of consequences flowing from its failure to note restrictions on transfer on the face of a security.[7] Again, Section 8–406(1) would appear to impose a coextensive duty upon the transfer agent.

Apparently the only case construing the interplay between Section 8–204 and the Securities Act of 1933 is *Edina State Bank v. Mr. Steak, Inc., supra*. In that case, the Tenth Circuit recognized a right to damages in favor of plaintiff bank against both defendants, the issuer and the transfer agent. The bank had accepted a pledge of the shares as security for a loan. It appears that the pledgor had received the stock in a private offering, but the issuer did not secure an investment letter or stamp a re-

---

5. For all the present record indicates, it appears that both defendants were genuinely interested in preventing a transfer which, in all likelihood, required registration or an opinion of counsel verifying the availability of an exemption from registration. While having failed to observe normal precautions in the transfers to New Jersey Zinc and Athena, they apparently saw the light and righteously decided that the "buck would stop" with the transfer to plaintiff. Unfortunately, the onus of their upstanding conduct fell directly on plaintiff.

6. The plan included issuance of additional shares to plaintiff's creditors which, plaintiff maintains, would have reduced the relative size of its holdings to less than 6%. See footnote 1 supra.

7. This section reads:
"Unless noted conspicuously on the security a restriction on transfer imposed by the issuer even though otherwise lawful is ineffective except against a person with actual knowledge of it."

strictive legend on the single certificate. The trial court found that although the bank had inquired of the pledgor as to the possible existence of restrictions and had been assured that none existed, this, in itself, could not alter the fact that a proposed transfer by the bank following a default on the loan was barred because it would violate the Securities Act. Because the trial court regarded both the issuer and the bank as innocent parties, it indicated that a higher duty of inquiry, including contacting the issuer, should have been imposed upon the bank. The Tenth Circuit reversed, noting that the terms of Section 8–204 aligns the relative duties by relieving the issuer of its responsibility to legend the certificate only if the ultimate purchaser acquired the shares with actual knowledge of the restriction. The court strictly construed this requirement of actual notice, finding that even though the bank was aware that the stock in question was privately held and that there was no market in the stock, this amounted only to inquiry notice. Furthermore, the court indicated that federal securities law should not be viewed as preempting the field since the Code provision, adding the requirement of noting the restriction on the security, could be harmonized with the federal statutes. In this regard, it is significant that the plaintiff there sought only damages, with the result that the court did not need to consider whether Section 8–204 could validate a transfer illegal under the Securities Act. The defendants had contended that since the transfer would not be "rightful" under the Securities Act, Section 8–401 relieved them from liability for refusing to transfer. The court rejected this argument, finding that the specific terms of Section 8–204 controlled over the more general terms of the former provision.

Defendants, in this case, seek to distinguish *Edina* solely on the ground that the block purchase there was only 2400 shares while that purchased here represented 13% of the outstanding shares. Under the analysis adopted by the Tenth Circuit, defendants must show that the size of the block amounted to actual notice to plaintiff of potential restrictions on transfer. Plaintiff claims to have been an unsophisticated investor who had received assurances from his seller that there were no restrictions.[8] Moreover, unlike the stock in *Edina, Alrac* was publicly traded in the over-the-counter market at the time of plaintiff's purchase. In contrast, the Tenth Circuit found that the bank lacked the requisite actual knowledge even though it was aware that the shares were privately held and the stock was not publicly traded. Finally, it is significant that this is not a case where plaintiff's seller succeeded to a control position by purchasing large amounts of stock in the open market. In such a situation, the issuer would have had no opportunity to legend the shares.[9] Here, in comparison, Alrac issued a single certificate representing a substantial interest without taking the fundamental precautions of either legending the shares or giving stop transfer instructions to its agent. Moreover, even though shareholder's meetings had been suspended since 1972, Alrac could not have been unaware of Athena's position in its stock since Athena had made the required Schedule 13D filings, a copy of which is sent to the issuer. For these reasons, upon the authority of *Edina State Bank v. Mr. Steak, Inc.,* *supra,* it appears that plaintiff's complaint states a viable cause of action and defend-

8. It is puzzling, however, that plaintiff has apparently elected to forego an action against his seller, Athena, under Section 12(1) or (2) of the Securities Act of 1933, 15 U.S.C. § 77*l* which imposes "virtually absolute" liability upon a purchaser's immediate seller for transfers violating Section 5 of the Act or which involve a misstatement of material fact. 3 Loss, *Securities Regulation* 1693 (2d ed. 1961). In contrast, this action, requiring inquiry into such subjective factors as defendants' reasonableness in refusing transfer and plaintiff's knowledge at the time of purchase, presents much more precarious grounds for liability. If plaintiff was not the unsophisticated investor he represents himself to be, defendants may avoid liability under § 8–204 if plaintiff had actual knowledge of the restriction.

9. In such a situation, the restriction would probably not be regarded as being imposed by the issuer under Section 8–204 so that no liability on this ground would arise.

ants' motion to dismiss on this ground is, therefore, denied.

### *Failure to Particularize—Count Two*

■ Alrac's objection under Rule 9(b) on the ground that the conclusory allegations of conspiracy contained in Count Two of the complaint is deficient can be disposed of easily. Rule 9(b) represents an exception to the federal rule that only notice pleading is required by stating that averments of fraud or mistake must be particularized. The Rule, by its terms, does not encompass claims of conspiracy such as those challenged here. Defendant relies, however, upon *Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir. 1972) which held that "a bare bones statement of conspiracy . . . without any supporting facts permits dismissal." The instant case, at least on its face, is not an example of the "pseudo-legal harassment" at which such summary dismissals on the pleadings are aimed. *See, e. g., Segal v. Gordon,* 467 F.2d 602, 608 (2d Cir. 1972). Moreover, far from being a "bare-bones statement of conspiracy," plaintiff details the facts underlying his claim of Alrac's involvement in the decision to refuse transfer. These factual allegations are sufficiently particular to permit defendant to respond and, therefore, this ground for dismissal lacks merit. *See generally, Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### *Dismissal for Lack of In Personam Jurisdiction—Count Two*

Plaintiff has demonstrated the existence of diversity upon which the state law claims, discussed above, depend for subject matter jurisdiction. The challenge on this ground is limited, therefore, to Alrac's claim that *in personam* jurisdiction was not acquired through extra-territorial service because it neither does business here [10] nor has it the minimal contacts with New York necessary to create "long-arm" jurisdiction under N.Y.C.P.L.R. § 302 (McKinney 1972).

This section provides that a court may exercise personal jurisdiction over a non-domiciliary who, by itself or through an agent, "(1) transacts any business within the state; or (2) commits a tortious act within the state . . . .."

■ In order to sustain a long-arm basis of jurisdiction, plaintiff must come forward with definite evidentiary facts supporting the connection of the non-domiciliary defendant with the New York transaction which forms the basis for suit. *Socialist Workers Party v. Attorney General of United States,* 375 F.Supp. 318 (S.D.N.Y.1974).

The factual predicates of plaintiff's claim are that A.S.T. was the transfer agent of Alrac at the time of the alleged wrongful refusal to transfer, and for several years prior to that. A.S.T.'s refusal to transfer occurred in New York. A.S.T. in its answer alleges that its acts were "solely pursuant to the authority and direction of its principal, Alrac Corporation." Moreover, there was admittedly correspondence between Alrac and A.S.T. concerning whether or not the transfer to plaintiff should be effected. Alrac maintains that its communications stopped short of directing A.S.T. to refuse transfer and amounted, instead, to simply cautioning A.S.T. to satisfy itself as to the legality of the transfer. It urges, on this ground, that since the correspondence did not prohibit transfer, Alrac cannot be said to have participated in the transaction underlying this suit. However, these communications submitted in support of Alrac's motion, must be read in the context in which they were written, during an escalating conflict among management and certain shareholders. It is impossible to determine at this point the true content and effect of Alrac's communications with A.S.T.

■ Contacts similar in nature and extent to those presented here have been held to be sufficient for long-arm jurisdiction. In *Kanton v. United States Plastics, Inc.,* 248 F.Supp. 353 (D.N.J.1965), plaintiff sued

---

10. Plaintiff does not claim, nor could it support a claim that Alrac is amenable to jurisdiction under the traditional corporate presence doctrine of "doing business."

an issuer and its transfer agent for wrongful refusal to transfer. The relationship of the defendants there resembled that of A.S.T. and Alrac, with the distinction that the court found that the issuer had affirmatively acted to prevent transfer. While the court did not hold that the mere presence of a transfer agent within the state would be a sufficient basis for personal jurisdiction, it did conclude that the issuer sufficiently participated in the acts at issue in the suit to make it consistent with the due process clause to subject the issuer to jurisdiction. The same conclusion was reached in *Gasarch v. Ormand Ind., Inc.,* 346 F.Supp. 550 (S.D.N.Y.1972), where the court, construing New York's long-arm statute, found that the transfer agent's refusal to act amounted to a tort committed within the state under N.Y.C.P.L.R. § 302(a)(2). Subsection 302(a)(1) applies with equal force to business transactions which give rise to a tort claim. *Wurtenberger v. Cunard Line Ltd.,* 370 F.Supp. 342 (S.D.N.Y.1974). For this reason, Alrac is amenable to jurisdiction here if it participated in the transactions underlying this suit within the meaning of N.Y.C.P.L.R. § 302(a)(1). This, of course, presents a triable issue of fact.

A word should be said at this point about plaintiff's second theory of liability under the Uniform Commercial Code, Section 8–204. The transaction forming the jurisdictional predicate here would be Alrac's failure to direct legending or the transfer agent's independent failure to legend the certificate either on the initial transfer to New Jersey Zinc or on the successive transfer to Athena. Alrac's prior transfer agent, Morgan Guaranty Co.,[11] was also located in New York. Section 8–204 would seem to create an absolute liability of the corporation for the errors of its transfer agent. Therefore, it would appear that plaintiff has carried its burden in establishing that the transaction relating to this theory of liability occurred here (assuming the transaction was improper) and, therefore, the requirements of Section 302(a)(1) are again met.

*Failure to State a Claim—Count Three*

Defendants move under F.R.C.P. 12(b)(6) to dismiss the third count of the complaint for failure to state a claim.[12] In this count, plaintiff seeks damages for Alrac's failure to file with the SEC the annual report (Form 10K) for 1975 as required by Sections 13(a) and 15(d) of the Securities Exchange Act of 1934.[13] Plaintiff charges that as a foreseeable result of Alrac's failure to file, the SEC suspended trading in April, 1976 which, in turn, made it impossible for plaintiff to find a purchaser.[14] In essence, therefore, plaintiff is asking the Court to recognize an implied, private damage action for failure to file the periodic reports required by the Exchange Act.

First of all, the Exchange Act clearly vests authority in the SEC to investigate violations of the filing requirements and to impose sanctions. Section 19(a) of the Securities Exchange Act, 15 U.S.C. § 78s(a). In an appropriate case, Section 21, 15 U.S.C. § 78u, allows the SEC to refer a violation to the Attorney General for possible prosecution. In addition, an express private damage action is created by Section 18(a), 15 U.S.C. § 78r(a) which imposes lia-

---

11. There is a possibility that yet a third transfer agent, Hartford National Bank, effected the transfer from New Jersey Zinc to Athena.

12. Defendant Alrac also claims that venue here is improper under Section 27 of the Exchange Act. 15 U.S.C. § 78aa. This issue will not be reached.

13. 15 U.S.C. § 78m(a), 78o(d). Defendant Alrac claims that its failure to file stemmed from the expense involved in securing the certified financials which must accompany the report. Because Alrac was a debtor in possession under Chapter XI of the Bankruptcy Act at this time, Alrac claims that the Bankruptcy Judge's approval would have been necessary to hire accountants. In this situation, plaintiff's claim would more aptly have been directed to a failure to file Form 8K, required when events occur which significantly affect the condition of the corporation, in this case filing the petition under Chapter XI.

14. The Skaneateles offer, the amount of which, according to plaintiff, fixes his damages, had already been withdrawn by this time.

bility for statements contained in these reports if the

"statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, [then the defendant] shall be liable to any person . . . who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance . . . ."

Plaintiff cannot state a claim under Section 18(a) for two reasons: (1) the wrong alleged is a failure to file, as opposed to the making of material misstatement and (2) plaintiff did not purchase or sell securities as a result of the failure to file. Instead, plaintiff's claim can be characterized as "but for" Alrac's violation of the reporting requirements, he would have been able to sell. For this reason, plaintiff's remedy, if one exists, must lie in an implied right of action for a failure to file which eliminates the standing provision of the statute, i. e., the requirement that a plaintiff have purchased or sold securities as a result of the violation.

Plaintiff, in *In re Penn Central Securities Litigation*, 494 F.2d 528 (3d Cir. 1974), similarly urged that court to dispense with the standing requirement through the device of an implied right of action. The only distinction from this case is that there the action was premised upon material misstatements in the filings. The court refused to recognize the implied right of action and, after reviewing decisions which had, in *dicta*, equivocally recognized such an action, stated that:

"[w]e have not been cited, nor have we found, any appellate decisions concerning the possible existence of a private right of action under 13(a). We believe the district court correctly held that § 18(a) is the exclusive remedy for alleged violations of § 13(a). Acceptance of plaintiffs' argument would result in the elimination of the purchaser-seller requirement for violations of § 13(a), a requirement which this court has recently held essential for standing under the general anti-fraud provision of § 10(b). We have not been

cited to any language or to any history in the 1934 Act which indicates that Congress intended to extend the protection offered by § 13(a) beyond the class of purchasers or sellers." [footnotes and citations omitted].

494 F.2d at 540. A conclusion identical to the Third Circuit's was reached in *duPont v. Wyly*, 61 F.R.D. 615, 628 (D.Del.1973). Similarly, Judge Weinfeld in *Myers v. American Leisure Time Enterprises, Inc.*, 402 F.Supp. 213 (S.D.N.Y.1975) refused to imply a private damage action, as opposed to a private action for injunctive relief, for violations of Section 13(d) of the Exchange Act, 15 U.S.C. § 78m(d), which contains reporting requirements analogous to those of Section 13(a).

While these cases involved claims premised upon misstatements in the filings, as distinct from a failure to file, plaintiff has not demonstrated any reason why this difference should be considered significant. The Commission, as discussed above, can impose sanctions for a failure to file. In fact, plaintiff's complaint is not aimed so much at Alrac's failure to file, but at the effect on the market of the SEC's imposition of one of these sanctions by suspending trading. Under plaintiff's novel theory, unsupported by any authority, almost any action on the part of an issuer which provoked a response from the SEC which had an adverse market effect would become actionable without the need to meet the strictures on private damage actions incorporated into the Securities Acts. Therefore, on the basis of the cases refusing to eliminate the purchase or sale requirement of Section 18(a), no implied private damage remedy lies for violations of Sections 13(a) and 15(d) of the Exchange Act, and defendant Alrac's motion to dismiss Count Three of the complaint is granted.

### Final Considerations

As a separate ground for dismissing the complaint, defendants ask for a ruling that plaintiff's failure to timely file a Schedule 13D bars him from maintaining

this action. Plaintiff claims that he made the filing as soon as he became aware, shortly after instituting this suit, that it was required.

In *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975), the Supreme Court held that a corporation alleging a violation of Section 13(d), 15 U.S.C. § 78m(d) by a defendant who had acquired its stock, must demonstrate irreparable harm in accordance with traditional principles of equity in order to obtain injunctive relief. The Court reached this conclusion even though defendant's purpose, when ultimately disclosed, was to acquire control. The Court reasoned that the purpose of this filing requirement was to provide information to shareholders to aid in their decision whether to accept a tender offer, not to aid corporations in defeating a tender offer. Because defendants have failed to demonstrate any injury flowing from plaintiff's delay in filing, it should not act as a bar to maintaining this action.

On a collateral issue, defendants claim that plaintiff's deposition reflects a desire to acquire control and that this conflicts sharply with statements in the Schedule 13D disavowing any such intent. This, of course, is simply another issue of fact which will be resolved at an appropriate time and which may bear upon plaintiff's claim that he was unaware that the shares might be restricted.

Finally, defendants' request that plaintiff be required either to post an undertaking or to pay their attorneys' fees under Section 18(a) of the Exchange Act, 15 U.S.C. § 78r(a). The dismissal of Count Three of the complaint, containing the securities claim, obviates the need for an undertaking. Since the Court finds that inclusion of the securities claim was not frivolous, an award of attorney's fees would be inappropriate. *Klein v. Shields & Co.*, 470 F.2d 1344, 1347–48 (2d Cir. 1972).

In summary, defendants' motion for judgment on the pleadings or for summary judgment is denied, except that Count Three of the complaint is dismissed under F.R.C.P. 12(b)(6) for failure to state a claim upon which relief can be granted.

SO ORDERED.